### UNITED STATES DISTRICT COURT
### DISTRICT OF MAINE

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 06-52-P-H** |
| | ) | |
| **DAVID PAUL NANOS,** | ) | |
| | ) | |
| **Defendant** | ) | |

### RECOMMENDED DECISION ON MOTION TO SUPPRESS

David Paul Nanos, charged with being a felon in possession of a firearm (a Mauser model HSc 7.65-millimeter semiautomatic pistol) in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1), *see* Indictment (Docket No. 13), seeks to suppress statements made and evidence seized as he was undergoing treatment at a hospital emergency room early on the morning of April 27, 2006. *See generally* Motion To Suppress Evidence ("Motion To Suppress") (Docket No. 26). An evidentiary hearing was held before me on October 13, 2006 at which the defendant appeared with counsel. At its conclusion, counsel for the parties argued orally, and defense counsel sought the opportunity to research and brief an issue on which he had not previously focused: the extent to which, for purposes of seizure of a latex glove from the floor of the defendant's hospital room, the defendant had a reasonable expectation of privacy in the room and/or glove. I granted this request, inviting the parties also to supply, if they could, authority on a second issue: whether removal of the defendant's clothing from him while he was a patient at the hospital constituted a seizure and, if so, an exception to the warrant requirement pertained. I directed that the parties file simultaneous briefs on these issues no later than November 15, 2006. They have done so. *See* Defendant's Supplemental Memorandum of Law in Support of Motion To Suppress ("Defendant's Supplemental Memo") (Docket No. 42);

Government's Supplemental Memorandum in Opposition to Motion To Suppress ("Government's Supplemental Memo") (Docket No. 43).   I now recommend that the following findings of fact be adopted and that the Motion To Suppress be granted in part, denied in part and deemed moot in part.

## I.  Proposed Findings of Fact

Jason McClure, a patrol officer for the Buxton Police Department ("Buxton PD") in Buxton, Maine, was on duty the evening of April 26, 2006 when, shortly after 11 p.m., he received a report from the Buxton PD dispatcher that two men had forced their way into the home of Mark Luxton at 48 Parker Farm Road in Buxton.  The dispatcher reported that the men had shot at Luxton, Luxton had returned fire, and Luxton believed the intruders still were inside his home.  McClure immediately drove to the Luxton home.  When he arrived approximately ten minutes later, two other Buxton PD officers, Kenneth Brislin and Paul Rubashkin, already were standing on the front porch questioning Luxton.  McClure joined them.

Luxton told officers he had gone to bed and was asleep when he heard voices outside his door.  Someone yelled that he should come out, then the front door was kicked in.  He rolled over and grabbed his handgun.  His bedroom door was kicked in, he saw several muzzle flashes from a gun, and he returned fire.  He heard yelling, then quiet.  He had not been shot, but his dog had been.

The three officers walked through the house.  They found Luxton's dog cowering inside, with an apparent gunshot wound to its chest.  They observed blood spattered on a wall and floor in the entryway as well as on a cement railing just outside the house.  They also found a human fingernail and the trigger to a handgun.  Sometime before midnight Buxton PD Chief Thomas, who had joined the officers at the Luxton home, advised the Buxton PD dispatcher to alert area hospitals to be on the lookout for someone with a gunshot wound.[1]  A Buxton PD operations report indicates that the

---

[1] No first name was provided for Chief Thomas, a woman.

dispatcher recorded at 12:18 a.m. that Maine Medical Center ("MMC") agreed to notify the Buxton PD if a patient arrived with a gunshot wound.  *See* Gov't Exh. 4 at 3.  At 12:24 a.m. the dispatcher noted that two other hospitals, Mercy Hospital and Southern Maine Medical Center ("SMMC"), had also so agreed, and at 12:32 a.m. that a fourth hospital, Goodall Hospital, had so agreed.  *See id.*[2]

Michael Reali, a patrol officer for the Biddeford Police Department ("Biddeford PD") in Biddeford, Maine, also was on duty the evening of April 26.  At about midnight he received a report from the Biddeford PD dispatcher that a dog-bite victim was undergoing treatment at SMMC.  This was the first dog-bite complaint he had received in his police career, which then spanned a period of about five-and-a-half years for three different police departments.

Reali traveled to SMMC and was directed to a room in the emergency department.  There, he found the defendant lying on a bed while nurse Dennis Parent worked on one of his hands, which was bloody and messy.  Reali observed that the defendant, who had specks of blood on his pants, sneakers and shirt, appeared to be intoxicated and, from his facial expressions and tone of voice, to be in quite a bit of pain.  Reali told the defendant he was there to ask him a couple of questions in reference to the report of a dog bite.  Soon after Reali entered the room, he noticed a woman walking in and out.  He asked who she was and why she was there, and she explained that she was the defendant's girlfriend, LeeAnne LaRiviere.

While LaRiviere was in the room, she and the defendant continued to converse in Reali's presence, growing irritated with each other.  Reali felt their interaction was interfering with his investigation.  He decided to separate the two, telling LaRiviere he needed to ask the defendant a couple of questions in reference to the dog-bite report, whereupon she left the room.  The defendant did not want LaRiviere to leave and asked why he was being separated from her; Reali responded that

---

[2] I take judicial notice that MMC and Mercy Hospital are located in Portland, Maine, SMMC is located in Biddeford, Maine, and (*continued on next page*)

he just needed to ask him some questions.  Parent also wanted LaRiviere to leave so that he could finish what he was doing.  Had the defendant at that point wanted to leave, Reali would not have told him he could not.  At some point prior to completion of Reali's investigation the defendant asked that his girlfriend be allowed to rejoin him.  Reali permitted her to do so.

Reali asked the defendant what had happened.  The defendant told Reali that he was in Biddeford on a vacant street behind the police department when he saw a Rottweiler whose owner he knew.  He approached the dog to apprehend it and bring it back to its owner.  The dog grabbed his arm and would not let go.  He kicked it to free his hand from the dog's mouth and the dog fled the area.  He said he encountered someone he knew, who transported him to the hospital.  The defendant declined to reveal the dog owner's name, saying he would take care of the dog himself later.  Reali took a close look at the defendant's hand, observing that the index finger was barely attached, the thumb was badly damaged and the wound was covered with dark, red blood.  He saw no teeth marks or impressions – just a deep, messy-looking cut.  He took digital photographs of the wounded hand.  He concluded the interview by asking the defendant to contact the Biddeford PD if he had any further information.  The defendant said he would.  Prior to leaving the hospital, Reali also spoke separately with LaRiviere in the hallway outside of the defendant's room.  He asked her several questions, including why she was there and how she knew the defendant.  As of the time Reali left SMMC, he was unaware of the occurrence of the Buxton home invasion.  Reali judged the defendant, during this initial encounter, to be fairly outgoing and to have willingly answered questions.

At 12:48 a.m., as Reali was traveling back to the police station to write his report on the dog-bite incident, he received a teletype from the Buxton PD requesting that anyone who had contact with a person with a gunshot wound report it to the Buxton PD.  He reviewed his digital photographs of the

---

Goodall Hospital is located in Sanford, Maine.

defendant's hand and contacted the Buxton PD, advising that he had a person in Biddeford who could have been shot.  He also contacted his supervisor, Bill Buhelt, who advised him to pull over and wait for him at an Amato's Restaurant ("Amato's") on Route 1.

Buhelt and Reali met at Amato's, where they decided to call in a third officer, Kenneth Hall. Once Hall arrived, the three traveled to SMMC.  Their foremost concern was that the defendant might have a weapon.  Upon reaching SMMC, the officers asked Parent to have a member of the hospital's security staff come down.  Parent informed the officers that the defendant had what appeared to be a gunshot wound.  Buhelt and Reali went to the defendant's room – the same room in which Reali had previously interviewed him.  The defendant was with LaRiviere.  Buhelt and Reali immediately separated the two, with Buhelt escorting LaRiviere to an adjacent storage room and remaining there with her while Reali stayed in the defendant's room.  As far as Reali was concerned, at that point the defendant was not free to leave the premises.  Reali searched the defendant for weapons, finding none.

At approximately 1:20 a.m. Reali, who had been trained as an evidence technician, decided to remove the defendant's clothing, which he reasoned might be laden with evidence.  He explained to the defendant that he was going to do so.  The defendant said little and sat with his hand over his eyes. Reali could tell that he was becoming irritated.  With Parent's help, Reali removed the defendant's clothing, consisting of a t-shirt, a pair of jeans, a pair of sneakers and possibly a pair of socks, and placed it into paper bags.  Parent pointed out to Reali a latex glove resting on the floor, turned inside out, that Parent said had been on the defendant's person when he arrived.  Reali collected that item, as well, and placed it in a bag.  The bags remained in the room, in Reali's presence, until Biddeford PD evidence technician Dave Finocchietti arrived later that morning in an evidence van.  Finocchietti and Reali then carried the bags out and placed them in the van.

During this second visit to SMMC, Reali again questioned the defendant about how he had received his injury.  The defendant repeated that he had been bitten by a dog.  Reali did not place the defendant under arrest or read him *Miranda* rights prior to questioning him either as part of his first interview (the dog-bite investigation) or his second interview (the Buxton home-invasion investigation).[3]  Reali did not seek the defendant's consent to seize either his clothes or the latex glove.

Reali noticed a marked change in the defendant's demeanor during this second encounter.  Whereas the defendant earlier had been relatively cooperative and outgoing, he became very irritable and unhappy and wanted his girlfriend back in the room.  At one point, while Reali was out in the hallway watching the room and Parent was tending to the defendant, the defendant got out of bed.  Parent told him not to leave.  The defendant continued on to the doorway.  Reali told him to listen to the nurse and get back into bed, and he did.  The defendant asked whether he was under arrest.  Reali told him he was not.

During Reali's second visit to SMMC Biddeford police learned, either from SMMC security or from the defendant himself,  that the defendant's car, a black Toyota, was parked in the SMMC parking lot.  Hall parked next to the vehicle to make sure no one touched it.  When Finocchietti arrived, he placed tape across both doors and the hatchback of the defendant's vehicle.

At about 1:50 a.m. Buxton PD officers McClure and Rubashkin arrived at SMMC.[4]  Reali briefed McClure and Rubashkin on what had transpired to that point – including the presence of LaRiviere, the discovery of the defendant's car in the parking lot, the defendant's consistent dog-bite

---

[3] Per *Miranda v. Arizona,* 384 U.S. 436 (1966), an accused must be advised prior to custodial interrogation "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 478-79.

[4] McClure testified that he and Rubashkin arrived at SMMC at approximately 1:10 a.m.  However, because it is clear from both (*continued on next page*)

story and the collection of the clothing in bags.  Reali also told McClure and Rubashkin that a Biddeford PD officer had checked the place where the dog attack allegedly had occurred and found no evidence of a dog or dog attack.  Upon McClure's and Rubashkin's arrival the Buxton PD took charge of the case.  Reali and Finocchietti remained on the scene to assist.

McClure spoke with an emergency-room doctor and asked him why he thought the defendant's wound was not a dog bite.  The doctor explained that he saw no puncture marks and that an x-ray (which he showed McClure) revealed that the hand appeared to be riddled with metal fragments.  McClure sent Rubashkin to speak with LaRiviere and then went to the defendant's room.  The defendant was sitting upright in bed, with his hand bandaged and propped up.  A nurse was present in the room.  Medical personnel continued to walk in and out of the room during the time McClure was there.  McClure asked the defendant what happened.  The defendant said he had been bitten by a friend's dog.  McClure questioned whether the defendant ever had been to Buxton.  He denied that he had.  McClure told him he believed his injury was a gunshot wound.  The defendant denied this, maintaining that he did not like guns and had never dealt with them or owned them.  McClure asked the defendant how the metal got in his wound.  The defendant attributed it to a gunshot wound he had sustained five years earlier in Portland, for which he was treated at MMC.  McClure checked this with Reali, who said he had investigated that story, and MMC had no record of having treated the defendant for a gunshot wound.  McClure confronted the defendant with this information.  The defendant said that maybe he should speak with his attorney.  McClure asked the defendant if he wanted to talk to his attorney.  The defendant replied, "Nah.  I'll keep talking to you."  McClure then continued to question him.  The defendant continued to maintain that he had not shot anyone and had been bitten by a dog. McClure described the defendant's demeanor during this interview as "I don't careish . . . not all that

---

Reali's and McClure's testimony that Reali collected the defendant's clothing prior to the Buxton PD officers' arrival, I credit Reali's (*continued on next page*)

concerned about what was happening." The defendant did wince a bit when he moved his hand but did not appear to McClure to be in any great pain. At no point did McClure read *Miranda* warnings to the defendant.

After McClure's and Rubashkin's arrival – it is not clear exactly when – Reali observed Rubashkin stationed outside of the defendant's hospital room. Reali assumed he was there to prevent the defendant from leaving the premises.[5]

After McClure spoke with the defendant, he contacted Buxton PD Chief Thomas. She directed him to return to the police department and assist another officer, Frank Pulsoni, in obtaining a warrant to search the defendant's vehicle. McClure did so, helping Pulsoni draft a search-warrant affidavit that stated that Pulsoni had probable cause to believe that the defendant had committed the crimes of burglary, reckless conduct with a dangerous weapon (a firearm) and attempted murder based on (i) Luxton's report of the home invasion, including his firing of multiple shots at the two male intruders, (ii) evidence found at the Luxton home, including bullet holes in the walls and drops of blood leading out the door and on a stone railing on the front step, (iii) the discovery of what Pulsoni termed "a second scene" behind a church just up the road from the Luxton home, where, among other things, tire tracks, beer bottles and a torn latex glove were found, (iv) receipt at 1:01 a.m. by the Buxton PD of a call from the Biddeford PD reporting that a subject had come to SMMC complaining of a dog bite to his right hand, (v) the report of the SMMC emergency staff to Biddeford police that after an x-ray of the injury they located shrapnel in the wound, indicating a possible gunshot injury, (vi) identification by emergency-room staff of the person being treated as David Nanos, date of birth September 3, 1983,

---

testimony that those officers arrived at 1:50 a.m.

[5] McClure testified that no officer was stationed outside the defendant's hospital room when he and Rubashkin arrived there and that Rubashkin left to interview LaRiviere in a separate room. However, McClure did not testify that no officer ever was stationed outside the defendant's room the entire time McClure was at SMMC. Thus, I do not view McClure's and Reali's testimony on this point as necessarily inconsistent. To the extent that they are, I credit Reali's testimony that he observed Rubashkin at some point standing (*continued on next page*)

and (vii) discovery by police of a motor vehicle in the SMMC parking lot that was registered to David Nanos, date of birth September 3, 1983.  *See* Gov't Exh. 1 at [6]-[7].

Based on this search-warrant application and affidavit, sometime in the early morning hours of April 27 McClure and Pulsoni obtained a warrant to search the vehicle from a justice of the peace. They returned to SMMC and showed the warrant to evidence technicians Reali and Finocchietti, who executed it at approximately 5 a.m.  Reali and Finocchietti turned over evidence derived from the search to McClure and Pulsoni, who took custody of it.

Several hours after McClure  first interviewed the defendant he placed him under arrest, charging him with aggravated reckless conduct with a firearm, burglary with a firearm and attempted murder.

On May 3, the Buxton PD also obtained a warrant to search the clothing and latex glove that Reali had seized and bagged at SMMC.  *See* Gov't Exh. 2 at [2].  That day McClure executed the warrant by opening the clothing bags.  He sent the contents to the Maine State Crime Laboratory on May 5.

In seeking a warrant to search the clothing and glove, McClure averred that he had probable cause to believe that the defendant had committed the crimes of burglary, reckless conduct with a dangerous weapon (a firearm) and attempted murder based on the same information supplied in the vehicle-warrant affidavit, plus the following:

> 8.     That the Biddeford P.D. collected David Nanos's DOB (09-03-83) clothes and a latex glove that David Nanos was wearing with a reddish brown stain on it.  Biddeford P.D.[,] believing that the clothes were evidence in a crime, collected them to prevent them from being destroyed.

> 9.     That the clothes were sealed in separate brown paper bags by Biddeford P.D. and the bags have not been opened since they were collected.

---

guard outside the defendant's room.

*Compare* Gov't Exh. 1 at [6] *with* Gov't Exh. 2 at [7]-[8].

## II. Discussion

In his Motion To Suppress the defendant identified four bases for suppression of evidence against him, namely that:

1.     He was placed under *de facto* arrest without probable cause from the moment police first accosted him at the hospital emergency room, as a result of which (i) his seemingly false exculpatory statements concerning the dog bite, (ii) the clothing and latex glove, (iii) the evidence gathered from his car and (iv) statements he made during telephone conversations that were overheard by a police guard should be suppressed.  *See* Motion To Suppress at 2-4 (citing *Wong Sun v. United States,* 371 U.S. 471 (1963)); *see also, e.g., United States v. Woodward*, 173 F. Supp.2d 64, 71 (D. Me. 2001), *aff'd*, 43 Fed. Appx. 397 (1st Cir. 2002) (evidence is suppressible as fruit of poisonous tree, pursuant to *Wong Sun*, if it has "been come at by exploitation of the illegality as opposed to by means sufficiently distinguishable to be purged of the primary taint") (citation and internal punctuation omitted).

2.     He was subjected to custodial interrogation without benefit of *Miranda* warnings, as a result of which his false exculpatory statements regarding the dog bite must be suppressed.  *See* Motion To Suppress at 4.

3.     The warrant to search his clothing was obtained on the strength of an affidavit that, when cleansed of reference to illegally obtained evidence, does not support a finding of probable cause, as a result of which the fruits of the search must be suppressed.  *See id*. at 5-7.

4.     The warrant to search the car was obtained on the strength of an affidavit that, on its face, did not support a finding of probable cause, as a result of which fruits of that search must be suppressed.  *See id*. at 7.

On these bases, he sought suppression of: (i) the clothing seized at the hospital and any test results obtained using it, (ii) any statements he made to police, (iii) any statements overheard by the police that he made to others, and (iv) any evidence seized from his vehicle and any test results obtained using material seized from his vehicle. *See id.*

In his post-hearing memorandum, he alternatively sought suppression of the clothing, the latex glove and any evidence derived from seizure of those items on the ground that he had a possessory interest in those items that police transgressed, in violation of the Fourth Amendment, by seizing them without his consent or a warrant. *See generally* Defendant's Supplemental Memo.

At hearing and in his post-hearing memorandum, counsel for the government made concessions and stipulations that narrow the scope of issues to be addressed. Specifically, he:

1.      Conceded, at hearing, that the Motion To Suppress has merit insofar as it concerns statements elicited from the defendant during Reali's second interview at SMMC (when Reali had shifted his focus to investigating the Buxton home invasion). He agreed that a reasonable person could view the defendant as having been "in custody" during the second Reali interview (which was not preceded by a *Miranda* warning).

2.      Represented, at hearing, that the government does not intend to introduce any statements made by the defendant that were overheard by police officers, thus mooting the Motion To Suppress with respect to such statements.

3.      Represented, in his post-hearing memorandum, that the government does not intend to introduce clothing seized from the defendant's person, thus mooting the Motion To Suppress with respect to those articles. *See* Government's Supplemental Memo at 4 & n.1.[6]

---

[6] I construe the government's representations that it does not intend to introduce certain statements and tangible evidence as stipulations that it will not in fact do so. I further construe its representation with respect to the clothing as a stipulation that it will not introduce evidence derived from seizure of the clothing. The government notes that it still intends to present testimony from Reali and (*continued on next page*)

11

These concessions and representations leave in play the following: (i) statements elicited from the defendant during Reali's first interview (focusing on the alleged dog bite), (ii) statements elicited from the defendant during McClure's interview, (iii) evidence gathered from the defendant's car and derived therefrom and (iv) the latex glove and any evidence derived from its seizure.

With respect to the defendant's assertions that he was placed under *de facto* arrest without probable cause and questioned while "in custody" without the requisite *Miranda* warnings, the government bears the burden of demonstrating the lawfulness of the challenged conduct. *See, e.g., United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992) (*Miranda* compliance); *United States v. Baldacchino*, 762 F.2d 170, 175 (1st Cir. 1985) (legality of warrantless arrest).

With respect to the defendant's challenge to the lawfulness of searches undertaken pursuant to warrants, a defendant bears the initial burden of demonstrating the invalidity of a warrant. *See, e.g., United States v. Longmire*, 761 F.2d 411, 417 (7th Cir.1985) ("The general federal rule on who bears the burden of proof with respect to an allegedly illegal search or seizure is based upon the warrant-no warrant dichotomy: If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality."); *see also, e.g., United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002) ("If a defendant is successful in establishing the invalidity of the search warrant, the burden then shifts to the Government to establish that the police relied in good faith on the judge's decision to accept the affidavit and issue the warrant.").

---

other witnesses regarding their observations of the defendant's clothing. *See* Government's Supplemental Memo at 4 n.1. As the government correctly observes, this testimony is admissible because there is no expectation of privacy with regard to what a person knowingly exposes to the public. *See, e.g., Maryland v. Macon*, 472 U.S. 463, 469 (1985) ("What a person knowingly exposes to the public is not a subject of Fourth Amendment protection[.]") (citation and internal punctuation omitted); *Pendleton v. City of Haverhill*, 156 F.3d 57, 64 (1st Cir. 1998) (there is no reasonable expectation of privacy in one's appearance).

Finally, as concerns the asserted possessory interest in the latex glove, a defendant shoulders the burden of establishing standing for Fourth Amendment purposes. *See, e.g., United States v. Romain*, 393 F.3d 63, 68 (1st Cir. 2004) ("The Fourth Amendment does not protect privacy in any and all circumstances. Among other limitations, a criminal defendant who wishes to embark upon a Fourth Amendment challenge must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized. Although the usage is imprecise, courts frequently refer to this threshold requirement as implicating 'standing.' For simplicity's sake, we shall adopt that nomenclature here.") (citations and internal quotation marks omitted).

In view of the government's concessions and stipulations, and for the reasons that follow, I recommend that the Motion To Suppress be (i) deemed moot insofar as it concerns statements overheard by the police, clothing seized from the defendant's person and evidence derived from that seizure, (ii) granted insofar as it concerns statements elicited during Reali's second interview of the defendant and during McClure's interview of the defendant and (iii) otherwise denied.

### A. Statements Elicited During Reali's First Interview

With respect to statements elicited during Reali's first interview (when Reali drove to SMMC in response to a dog-bite complaint), counsel for the government contended at hearing that the defendant was not then in custody given that Reali (i) was investigating a dog-bite complaint and did not know about the Buxton home invasion, (ii) separated the defendant from LaRiviere only because she was interfering with his interview and eventually permitted her to return to the room, and (iii) left the premises when his investigation was complete. The government also pointed out that (i) at no point during this interview did Reali arrest or restrain the defendant and (ii) the interview was brief and transpired in the neutral surroundings of a hospital. *See* Government's Opposition to Defendant's Motion To Suppress Evidence (Docket No. 29) at 10. The government meets its burden of proving

13

that, as of the time of the defendant's first interview, he was not either under *de facto* arrest or "in custody" for *Miranda* purposes.

The obligation of an officer to administer *Miranda* warnings attaches "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Stansbury v. California*, 511 U.S. 318, 322 (1994) (citations and internal quotation marks omitted).  Whether a person can be considered to have been in custody depends on all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id*. (citation omitted).  Similarly, "an investigatory stop constitutes a *de facto* arrest [for which probable cause is required] when a reasonable man in the suspect's position would have understood his situation, in the circumstances then obtaining, to be tantamount to being under arrest." *Flowers v. Fiore*, 359 F.3d 24, 29 (1st Cir. 2004) (citations and internal quotation marks omitted).

"[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 323.  *See also United States v. Quinn*, 815 F.2d 153, 157 (1st Cir. 1987) (relevant inquiry "is how a reasonable man in the suspect's position would have understood his situation") (citation and internal quotation marks omitted).  "Among the factors to consider" in making a *Miranda* custody determination "are whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003) (citation and internal quotation marks omitted).

No reasonable person in the defendant's shoes would have considered himself, during Reali's first interview, to have been placed under police constraints tantamount to an arrest. Reali never told the defendant or implied to him that he was under arrest. He simply announced that he wanted to ask him questions about his own report of a dog attack. He never touched the defendant or otherwise restricted his freedom of movement. He did not convey by display of weaponry or voice commands that the defendant was not free to leave. He came alone to the hospital, stayed less than an hour, then left. While it is true that Reali did separate the defendant's girlfriend from him, no reasonable person in the circumstances could have understood this as imposing a restraint tantamount to arrest on the defendant. The defendant and his girlfriend had been conversing and had become irritated with each other while Reali was endeavoring to complete his interview. Only at that point – when their interaction was impeding Reali's progress – did he separate the two. Later, when the defendant requested that LaRiviere be permitted to rejoin him, she was allowed to do so. In similar circumstances, hospitalized suspects have been found not to have been in custody for *Miranda* purposes. *See, e.g., Gren v. Greiner*, 89 Fed. Appx. 754, 757 (2d Cir. 2004) (state courts were not unreasonable in concluding that hospitalized suspect was not "in custody" during questioning by detective in circumstances in which detective obtained permission from attending physician to speak to suspect, suspect was not handcuffed, detective was the only police officer in the hospital room and asked suspect limited number of questions, no officer was stationed in room prior to interview, and nature of interview was investigatory rather than accusatory); *United States v. Turcotte*, No. CRIM.01-74-B-S, 2002 WL 265108, at *3-*4 (D. Me. Feb. 22, 2002) (rec. dec., *aff'd* Mar. 18, 2002) (hospitalized suspect not "in custody" during questioning first by one officer, then by another, when police arrived because alerted by hospital that person had been injured by pipe bomb, no officer suggested suspect's freedom would be restrained in any fashion, and medical personnel were freely

coming and going in neutral setting over which police exercised no control); *United States v. Caldwell*, No. CIV. A. 94-310-01, 1995 WL 461224, at *4 (E.D. Pa. Aug. 2, 1995), *aff'd*, 116 F.3d 470 (3d Cir. 1997) (hospitalized suspect not "in custody" during questioning by two agents when he had checked himself into hospital voluntarily for treatment of gunshot wound, agents had not placed him under arrest or otherwise restrained his freedom to come and go in any way, and there were numerous family members in room).

Inasmuch as the defendant was neither "in custody" for *Miranda* purposes nor placed under *de facto* arrest during the first Reali interview, statements elicited during that interview are admissible at trial.

### B.  Statements Elicited During McClure's Interview

I reach quite a different conclusion concerning statements elicited during McClure's interview of the defendant during the early-morning hours of April 27, 2006.  At hearing, counsel for the government maintained that the confluence of events that supported a conclusion that the defendant was in custody during the second Reali interview had largely dissipated by the time of the McClure interview.  He argued that (i) the McClure interview was brief and much less confrontational than the second Reali interview, (ii) per McClure's testimony, no officer was then stationed outside of the defendant's hospital room, and (iii) nothing at that time prevented the defendant from leaving the premises other than his medical condition.

Defense counsel rejoined that no indicia of *de facto* arrest had changed or dissipated such that a reasonable person in the defendant's shoes would have considered himself suddenly free to leave as of the time of the McClure interview.  He  underscored that as of the time McClure entered the defendant's room, police had (i) stripped the defendant's clothes from his person without his consent, (ii) told him not to leave his room and (iii) denied him contact with his girlfriend, who was serving as

his support person following a serious injury.  Further, defense counsel pointed out that, per Reali's testimony, at some point during McClure's investigation Rubashkin was standing guard outside the defendant's hospital room.  He reasoned that the defendant was "in custody" during the McClure interview, as a result of which McClure's failure to administer *Miranda* warnings was fatal to admission of any statements he elicited from the defendant.

Defense counsel has the better of the argument.  No reasonable person in the defendant's position as of the time McClure entered his treatment room would have considered himself free to come and go as he pleased.  From the standpoint of a person in the defendant's shoes, it did not matter that Reali was an officer of the Biddeford PD and McClure an officer of the Buxton PD.  Rather, what mattered was that police had usurped significant control of the defendant's environment, having stripped the clothes off of his person without his consent, searched him for weapons, separated him from his girlfriend and ordered him to obey his nurse and return to his bed when he attempted to leave his room.  None of these indicia of police control and dominion were distant memories as of the time McClure arrived on the scene;  indeed, those events had transpired approximately thirty minutes earlier.

What is more, nothing that McClure or other officers proceeded to say or do dissipated that ambience; to the contrary, McClure's questioning was more accusatory than investigatory, *compare, e.g., Gren*, 89 Fed. Appx. at 757, no one advised the defendant that he was free to leave, to ask officers to leave or to remain silent, no one offered to permit his girlfriend to rejoin him, and Reali observed Rubashkin standing outside the defendant's door, reasonably inferring that he was so stationed to prevent the defendant – by then a suspect in the Buxton home invasion – from leaving the premises.  In the circumstances, the defendant not only was "in custody" at the time of McClure's arrival but also remained so throughout his interview.  *See, e.g., United States v. Barlow*, 839 F.

17

Supp. 63, 66 (D. Me. 1993) (although courts are unlikely to find that an interview taking place in a defendant's home is "custodial" because of familiarity of surroundings, interview of defendant in his home was "custodial" when he was told he had to be in the presence of an agent at all times, was searched, was kept under observation, had his phone answered by agent and was never told he was free to go).

Inasmuch as the defendant remained "in custody" throughout the McClure interview, McClure's failure to administer *Miranda* warnings is indeed fatal to admission at trial of any statements he elicited from the defendant at SMMC. *See, e.g., United States v. McLean*, 409 F.3d 492, 498 (1st Cir. 2005) ("If the defendant is not advised of his *Miranda* rights and has not validly waived them, the police are prohibited from interrogating him[,] and any statements obtained in violation of this rule will be excluded from evidence at trial.") (citation and internal quotation marks omitted).[7]  Statements made to McClure at SMMC accordingly should be suppressed.

### C. Vehicle Search and Seizure

I turn to the defendant's bid to suppress materials seized from his car and results of testing of such materials.  *See* Motion To Suppress at 3-7.  The defendant articulates two bases for suppression of this particular evidence: that (i) it qualifies as fruit of the poisonous tree of his *de facto* arrest without probable cause, and (ii) the vehicle-search affidavit, on its face, does not convey probable cause to search the vehicle.  *See id*.

---

[7] Counsel for the government also argued at hearing that the defendant did not sufficiently clearly invoke his Sixth Amendment right to an attorney that his statements to McClure can be suppressed on the basis of continued questioning following his mention of an attorney.  I agree.  After the defendant commented that maybe he should speak with his attorney, McClure pointedly asked him if he wished to do so, whereupon he replied, "Nah.  I'll keep talking to you."  As this court has noted, "[I]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *United States v. Feyler*, 55 F. Supp.2d 55, 61 n.5 (D. Me. 1999) (citation and internal quotation marks omitted); *see also, e.g., United States v. Libby*, No. CRIM. 04-26-B-W, 2004 WL 1701042, at *6 (D. Me. July 30, 2004) (rec. dec., *aff'd* Sept. 27, 2004) ("If a defendant subjected to custodial interrogation unequivocally invokes his right to counsel, all questioning must cease.  To activate the prohibition on continued questioning, however, the request for counsel must be unambiguous.") (citations omitted).  But this argument avails the government nothing in the absence, as here, of *Miranda* warnings in the first instance.

As discussed above, during officers' second visit to SMMC (following Reali's receipt of the Buxton PD teletype at 12:48 a.m. on April 27) they did place the defendant under *de facto* arrest. From all that appears of record, he continued in that status through the time McClure officially placed him under arrest later that morning (most likely after McClure returned to SMMC with the vehicle search warrant at about 5 a.m.). The defendant posits that, in violation of the dictates of the Fourth Amendment, he was arrested without probable cause inasmuch as police knew only that a home invasion had been committed and that, several hours later, a person was at the hospital with what appeared to be a gunshot wound to his hand. *See id*. at 3. He asserts that police had no eyewitness identification, no gun, no incriminating statements or any other evidence of his complicity in the home invasion. *See id*. He maintains that all evidence gathered as a result of his unlawful arrest (including the vehicle evidence) must be suppressed. *See id.; see also, e.g., United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998) ("Under the 'fruit of the poisonous tree' doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation."); *United States v. Bienvenue*, 632 F.2d 910, 913 (1st Cir. 1980) ("Evidence obtained directly or indirectly from a violation of the fourth amendment is not admissible against an accused at trial.") (citations omitted).

As the First Circuit recently has reiterated:

Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime. The inquiry into probable cause focuses on what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances. Probable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

19

*United States v. Vongkaysone*, 434 F.3d 68, 73-74 (1st Cir. 2006) (citations and internal punctuation omitted).  An officer's determination that a crime has been committed need not be "ironclad" or even "highly probable"; it need only have been "reasonable" to satisfy the standard of probable cause. *United States v. Winchenbach*, 197 F.3d 548, 555-56 (1st Cir. 1999); *see also, e.g., Roche v. John Hancock Mut. Life Ins. Co*., 81 F.3d 249, 255 (1st Cir. 1996) ("[O]ne who asserts the existence of probable cause is not a guarantor either of the accuracy of the information upon which he has reasonably relied or of the ultimate conclusion that he reasonably drew therefrom.").

While officers did not have direct evidence, as of the time the defendant was placed under *de facto* arrest, that he was one of the perpetrators of the Buxton home invasion, I am satisfied that they had probable cause to believe that he was inasmuch as:

1.       Police had strong evidence that at least one of two men who had invaded Luxton's home had been shot.  Luxton said he had returned fire and had heard yelling.  Consistent with this story, spatters of blood had been found in the home's entryway and on a railing outside.

2.       As of the time the defendant was placed under *de facto* arrest officers knew, from nurse Parent, that the defendant had sustained what appeared to be a gunshot wound.  Reali also had viewed and photographed the wound himself and had noted an absence of the presence of bite marks. The officers reasonably could have inferred that the dog-bite story was a lie.

3.       Inasmuch as appears, no other area hospital had reported the presence of a gunshot-wound victim, although MMC, Mercy Hospital and Goodall Hospital, as well as SMMC, had agreed to do so.

4.       Among evidence found at the Luxton residence was a human fingernail and a handgun trigger.  The defendant's wound was to his hand.

These circumstances sufficed to permit officers to draw a reasonable – if not ironclad or even highly probable – conclusion that the defendant had been a perpetrator of the Buxton home invasion. Evidence gathered as a result of the vehicle search hence is not suppressible as fruit of the poisonous tree.

Nor, for similar reasons, does the defendant succeed in his challenge to the facial sufficiency of the Pulsoni affidavit as supporting a finding of probable cause to search the defendant's vehicle. "Probable cause exists when the affidavit upon which a warrant is founded demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it." *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir. 1996) (citation and internal quotation marks omitted). Both the issuing magistrate and a subsequent reviewing court look to "the totality of the circumstances indicated [within the four corners of] a supporting affidavit" to assess the existence *vel non* of probable cause. *Id.*; *see also, e.g., United States v. Vega-Figueroa*, 234 F.3d 744, 755 (1st Cir. 2000). "Yet such review cannot start from scratch. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Schaefer*, 87 F.3d at 565 (citation and internal quotation marks omitted).

The Pulsoni affidavit informed the issuing justice of the peace not only of facts from which one reasonably could have concluded that at least one of the Buxton home-invasion suspects had been shot and wounded but also that (i) after the Buxton PD had alerted area hospitals to report the presence of any patient with a gunshot wound, police learned that the defendant was undergoing treatment at SMMC for an apparent gunshot wound to his right hand, (ii) medical personnel confirmed via x-ray the presence of shrapnel in the wound, although the defendant had complained of a dog-bite injury, and (iii) police had confirmed that the vehicle in the SMMC parking lot was registered to the defendant. *See* Gov't Exh. 1 at [6]-[7]. There is no basis on which to disturb the issuing justice of the peace's

21

conclusion that there was sound reason to believe that fruits of the Buxton home invasion such as those listed by Pulsoni (blood, latex gloves, a firearm) would be found in the defendant's vehicle.[8]

The Motion To Suppress, insofar as it concerns evidence derived from the defendant's vehicle, accordingly should be denied.

### D. Clothing Search and Seizure

The defendant proffers three bases for suppression of the clothing seized from his person and the latex glove seized from the floor nearby him as he was undergoing treatment at SMMC: that (i) this evidence was fruit of the poisonous tree of his *de facto* arrest without probable cause, (ii) when cleansed of illegally obtained evidence, the affidavit submitted in support of the application for a warrant to search his clothing does not support a finding of probable cause, and (iii) the clothing and glove, in which he had a possessory interest, were illegally seized from his person and bedside without consent, a warrant or an exception to the warrant requirement. *See* Motion To Suppress at 3-7; *see generally* Defendant's Supplemental Memo.

As noted above, the government represents that it will not seek to introduce into evidence clothing seized from the defendant's person, mooting the Motion To Suppress as it pertains to those items. *See* Government's Supplemental Memo at 4 & n.1. The only article of clothing in issue hence is the glove seized from the SMMC treatment-room floor. With respect to that item, I agree with the

---

[8] At hearing, counsel for the government argued that the taping of the car doors pending issuance of the search warrant was a minimal and reasonable intrusion, akin to stationing an officer outside a home pending issuance of a warrant to search a dwelling. I do not understand the defendant to be arguing that his vehicle was wrongly seized. *See* Motion To Suppress at 3-7. In any event, in this case, in which police had probable cause to believe the vehicle contained fruits of a crime but took the precaution of securing a search warrant, the intrusion of "securing" the car did not offend the Fourth Amendment. *See, e.g., United States v. Burton*, 288 F.3d 91, 100-01 (3d Cir. 2002) ("While a seizure or search of property without a warrant ordinarily requires a showing of both probable cause and exigent circumstances, the ready mobility of automobiles permits their search based only on probable cause. . . . As the Supreme Court explained, for constitutional purposes, [the Court] see[s] no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment.") (citations and internal punctuation omitted). (*continued on next page*)

government that the defendant fails to establish the existence of a constitutionally protected possessory interest. *See id.* at 4-5. That is fatal to his bid for suppression of that item. *See, e.g., United States v. Mancini*, 8 F.3d 104, 107 (1st Cir. 1993) ("It is well settled that a defendant who fails to demonstrate a legitimate expectation of privacy in the area searched or the item seized will not have 'standing' to claim that an illegal search or seizure occurred. In order to make such a demonstration, the defendant must show both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable. The burden of proving a reasonable expectation of privacy lies with the defendant.") (citations omitted).

The defendant does not contend that he harbored a reasonable expectation of privacy in the SMMC treatment room itself; however, relying on *United States v. Neely*, 345 F.3d 366 (5th Cir. 2003), he argues that he had a constitutionally protected possessory interest in the clothing and glove that Reali transgressed when he seized those items without consent or a warrant. *See generally* Defendant's Supplemental Memo.

As the government posits, *see* Government's Supplemental Memo at 4-5, the glove seized in this case is distinguishable from the clothing taken in *Neely*. In *Neely*, medical personnel had removed the defendant's clothing after he was rushed by ambulance to a hospital shock-trauma unit and placed it in a plastic bag. *See Neely*, 345 F.3d at 368. The hospital's patient-care coordinator testified that, in circumstances such as those, items were inventoried, placed in a plastic bag and put into a clothing storeroom where they were kept for five to six days and then thrown away if the owner did not claim them. *See id.* She affirmed that the hospital considered such clothing to belong to the patient even while in the hospital's possession. *See id.* While the defendant was in surgery or shortly thereafter,

police requested his clothes from medical personnel, who turned them over. *See id*. Police did not

have a warrant for seizure of the clothes. *See id*. The *Neely* court held that the defendant had not

forfeited his possessory interest in his clothing by entering the hospital for treatment and that police

presumptively violated his Fourth Amendment rights by retrieving his clothes from the hospital. *See*

*id*. at 370. The court observed:

> The Government presented no evidence indicating that [the defendant] had done
> anything to suggest he had given up the possessory interest in his clothes, and the
> hospital's policy of placing the clothing in a bag and putting it in a locker in the
> clothing storage room suggested that it was holding the clothes for him until he
> recovered. The Government's theory that the hospital jointly possessed the clothing
> and therefore had authority to hand them over to the police upon request also fails
> because the patient care coordinator called at the hearing testified that the hospital
> considers such clothing items the patient's possessions and does not consider itself an
> owner of the clothes. She further explained that clothing such as [the defendant's],
> even when covered with blood, would be stored for the patient and only discarded if
> the patient or a family member did not attempt to retrieve the clothing after five to six
> days. The Government presented no evidence at the suppression hearing that hospital
> staff did not follow this procedure with regard to [the defendant's] clothes. Therefore
> we find that [the defendant] retained a sufficient possessory interest in the clothes to
> complain of this seizure and that, absent application of an exception to the warrant
> requirement, we must hold the seizure unreasonable under the Fourth Amendment.

*Id*. at 370-71.

In this case, by contrast, the only evidence concerning the glove is Reali's testimony that

Parent, the nurse who was treating the defendant at SMMC, pointed that item out to him as it lay on the

floor near the defendant's hospital bed, whereupon Reali seized it. In the absence of any indication

that SMMC would consider such an item the property of the patient, or that the defendant himself

expressed any possessory interest in it, the most reasonable inference one can draw is that this

particular item of clothing – which is disposable by nature – had been discarded. Had Reali not

seized it, it likely simply would have been swept up and thrown in the trash. "[N]o person can have a

reasonable expectation of privacy in an item that he has abandoned[.]" *United States v. Paradis*, 351

F.3d 21, 31 (1st Cir. 2003) (citation and internal quotation marks omitted).

As the government posits, this case is closer to *United States v. Franklin*, 64 F. Supp.2d 435 (E.D. Pa. 1999), in which the court determined that the defendant had abandoned clothing seized from the floor of a hospital treatment room, than to *Neely*. *See* Government's Supplemental Memo at 5; *Franklin*, 64 F. Supp.2d at 439 ("[A] defendant has no expectation of privacy in discarded property. In this case, there is uncontradicted testimony from the police officer that the hospital would have thrown the articles of clothing on the floor out in the garbage. The clothing was contaminated with blood and had been cut up in the process of removing it from the defendant. At no point did the defendant object or assert any ownership rights in this clothing. Under these circumstances, we do not believe that society would accept a claim of privacy in such destroyed clothing as reasonable. The failure of defendant to object is inconsistent with an expectation of privacy.") (citations omitted).

The defendant accordingly falls short of proving the requisite possessory interest to seek suppression of the glove. This determination is dispositive of all three bases on which he seeks suppression of that item. Nonetheless, alternatively, I note that his bid for suppression on grounds that (i) the seizure of the clothing was the fruit of an illegal *de facto* arrest and (ii) the search-warrant affidavit does not supply probable cause to search the clothing fail in any event. As discussed above in the context of the defendant's bid to suppress evidence obtained from his vehicle, his *de facto* arrest was supported by probable cause to believe that he had been a perpetrator of the Buxton home invasion.

With respect to the search warrant, the defendant argues that paragraph 8 of the search-warrant affidavit must be expunged and, once this is done, the affidavit does not convey probable cause to seize or search the clothing. *See* Motion To Suppress at 5-7; *see also, e.g., Woodward*, 173 F. Supp.2d at 67 ("When a court reviews an affidavit from which unconstitutionally seized evidence has

been excised, it must independently determine if such probable cause remains within the affidavit that a neutral magistrate would have issued the subject warrants.") (citation omitted).[9]

Paragraph 8 of the McClure affidavit states that the Biddeford PD had collected the defendant's clothing and a latex glove he had been wearing with a reddish-brown stain on it, which the Biddeford PD believed was evidence of a crime. *See* Gov't Exh. 2 at [8]. Even with that paragraph expunged, inasmuch as the McClure affidavit conveys probable cause to link the defendant to the Buxton home-invasion crime, it supports a finding of probable cause to believe that the clothes he was wearing would yield evidence of that crime. *See id*. at [7]-[8].

### III.  Conclusion

For the foregoing reasons, I recommend that the Motion To Suppress be (i) **DEEMED MOOT** insofar as it concerns statements overheard by the police, clothing seized from the defendant's person and evidence derived from that seizure, (ii) **GRANTED** insofar as it concerns statements elicited during Reali's second interview of the defendant, and McClure's interview of the defendant, at SMMC and (iii) otherwise **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which* <u>de</u> <u>novo</u> *review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.   A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

---

[9] The First Circuit has left open the question whether any deference should be paid to an issuing magistrate's determination of probable cause in circumstances in which the reviewing court expunges information from a search-warrant affidavit after the fact. *See United States v. Dessesaure*, 429 F.3d 359, 368 n.8 (1st Cir. 2005).  For purposes of the instant discussion, I do not rely on any presumption in favor of the correctness of the decision to issue the warrant.

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 30th day of November, 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge